IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2015

**LAJEANRA E. POLK v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40801092     Michael R. Jones, Judge**

---

**No. M2015-00431-CCA-R3-PC – Filed June 7,  2016**

---

The Petitioner, LaJeanra E. Polk, filed a petition in the Montgomery County Circuit Court, seeking post-conviction relief because her counsel was ineffective.  The post-conviction court denied the petition, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Debra A. Wall, Clarksville, Tennessee, for the Appellant, LaJeanra E. Polk.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Helen Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On August 4, 2008, the Petitioner and her cousin, Nicole T. Davis, were indicted for the first degree premeditated murder and felony murder of the victim, Carolyn Vega-Velasquez, in November 1995.  State v. Lejeanra E. Polk, No. M2011-00226-CCA-R3-CD, 2011 WL 5022816, at *1, 3 (Tenn. Crim. App. at Nashville, Oct. 21, 2011).  At a bench trial, the Petitioner was convicted of second degree murder and felony murder.  Id. at *1.  The trial court merged the convictions into a single conviction of felony murder and imposed a sentence of life imprisonment.  Id.

The Petitioner appealed, challenging the sufficiency of the evidence sustaining her convictions.  Id.  On direct appeal, this court summarized the proof adduced at trial as follows.  On November 30, 1995, the Montgomery County Sheriff's Department (MCSD) was informed that a body had been seen lying on the victim's living room floor, and deputies were dispatched to the victim's residence.  Id.  The deputies forced entry into the home and discovered the victim lying face-up on a rug on the living room floor.  Id. at *1, 2.  She apparently had been dead for days.  Id.  She had been bound with a telephone cord and had suffered blunt force trauma to the head and multiple stab wounds.  Id.

The deputies saw that "the living room, home gym, stairway and master bedroom were 'messed up,'" while the remaining areas were clean.  Id. at *1.  The "unkempt areas appeared as though 'a robbery or a struggle or something had taken place.'"  Id.  Notably, in the gym area, police discovered that an electronic item was missing from an entertainment center and found "'vacant' spots in a cabinet that contained compact discs."  Id.  In the master bedroom, the victim's purse had been dumped out on the floor, a lamp was turned over, and drawers were opened, leading the deputies to conclude that "'it was definitely obvious that something had been taken'" from the home. Additionally, the deputies found blood spatter in the gym area and the living room.  Id. at *2.  A pair of scissors, which the deputies believed caused the stab wounds, was found near the victim's body.  Id.  The police discovered no forensic evidence, such as fingerprints or deoxyribonucleic acid (DNA), to implicate a suspect or suspects.  Id.

No progress was made in the case until the Petitioner contacted the Metropolitan Nashville Police Department on October 11, 2006.  The Petitioner said that she wanted "to discuss the Clarksville murder of 'a Hispanic lady . . . [who] was tied up and left on the floor' of her home."  Id.  When the Petitioner was interviewed, she refused to sign a Miranda waiver and seemed anxious, but she willingly told the authorities that she and Ms. Davis went to the victim's home on the night of the victim's death.  Id.  While they were there, the Petitioner frequently went to the bathroom to use crack cocaine.  Id.  During one of these visits, she heard a commotion.  Id.  When she returned from the bathroom, the victim was lying on the floor with her hands tied.  Id.  Although the victim asked for the Petitioner's help, the Petitioner ran to the car and waited for Ms. Davis.  Id.  The Petitioner said she fled because she feared Ms. Davis.  Id.  The Petitioner said that Ms. Davis came to the car with some of the victim's belongings, and they drove away.  Id.

On January 25, 2007, the Petitioner was interviewed in St. Petersburg, Florida.  Id.  During the interview, she admitted that she was at the victim's home on the night of the offense but claimed she spent most of the evening in the bathroom using crack cocaine

and that she did not see the victim harmed in anyway.  Id.  She also denied that she had spoken with the police in October 2006.  Id.

The autopsy revealed that the victim was stabbed sixteen times in the chest and abdomen, likely with a steak knife, and that she was struck forcefully a number of times in the head.  Id. at *3.  The victim's arms showed ligature marks, and she had a bite mark on her left arm.  Id.  Additionally, contusions on the victim's neck suggested she had been strangled.  Id.

Ms. Davis testified that on the night of the victim's death, she and the Petitioner went to the victim's home.  Id.  On the way, the Petitioner said that they were going to rob her friend.  Id.  At the victim's home, the women drank alcohol, smoked marijuana, and used crack cocaine.  Id.  Suddenly, the Petitioner sprayed pepper spray in the victim's face and knocked the victim to the floor.  Id.  The Petitioner strangled the victim, got a knife from the kitchen, then stabbed the victim.  Id.  Ms. Davis handed the Petitioner a telephone cord and helped tie the victim's hands.  Id.  The Petitioner removed a knife, glass, and wine bottle from the scene, which she later discarded in a dumpster.  Id. at *3, 4.  The Petitioner told Ms. Davis to take some of the compact discs.  Id. at *3.  Ms. Davis said that she did not tell the police immediately because she feared the Petitioner.  Id. at *4.

Stephanie Brewer, who shared a jail pod area with the Petitioner and Ms. Davis, testified that the Petitioner admitted that she stabbed the victim multiple times and that she and Ms. Davis took a radio and compact discs from the victim's residence.  Id.  Ms. Brewer said that Ms. Davis acknowledged that she handed the knife to the Petitioner, that she also stabbed the victim, and that she helped the Petitioner tie the victim's hands with telephone cord.  Id.

The Petitioner testified that she had mental health issues, that she had been hospitalized for psychiatric problems on multiple occasions, that she had been diagnosed with manic depression, and that she received Social Security disability payments.  Id. The Petitioner asserted that she had at least $4,000 in the bank at the time of the victim's death.  Id.  The Petitioner said that on the day of the victim's death, she and Ms. Davis went to the victim's home, drank wine, and smoked marijuana and crack cocaine.  Id. at *5.  The Petitioner occasionally went to the bathroom to smoke more crack cocaine.  Id. On one occasion when she was in the bathroom, she heard something.  Id.  She opened the door and saw Ms. Davis spray mace in the victim's face.  Id.  The Petitioner returned to the bathroom and tried to call 911 but could not get the telephone to work.  Id.  Twenty minutes later, the Petitioner left the bathroom, grabbed her purse, and went to her car.  Id. She saw a plastic storage container in the backseat, which had not been there earlier.  Id. When Ms. Davis came to the car, she had a plastic grocery bag.  Id.  The Petitioner said that she did not see a knife and did not assist Ms. Davis with the assault or robbery.  Id.

- 3 -

The Petitioner asserted that she "went to the police station in October 2006 because her family had 'pushed her away' and she felt like people related to the victim were following her." Id. She did not recall having met Ms. Brewer and denied confessing her participation in the crimes to Ms. Brewer. Id.

On appeal, this court affirmed the judgment of the trial court, concluding that the evidence was sufficient to sustain her convictions. Id. at *1. The Petitioner filed an application for permission to appeal to our supreme court, which was denied on February 16, 2012.

Subsequently, on January 23, 2013, the Petitioner filed a timely pro se petition for post-conviction relief, alleging that her counsel was ineffective. An attorney was appointed to represent the Petitioner and filed an amended post-conviction petition, listing numerous allegations of ineffective assistance of counsel.

At the post-conviction hearing, the fifty-one-year-old Petitioner testified that she suffered from diabetes, high blood pressure, neuropathy, and arthritis. In addition, she had been diagnosed as "manic depressive," "bipolar," and "schizo-affective" and had been prescribed medication for the mental illnesses. The Petitioner acknowledged that she did not take her medication as prescribed, explaining that she wanted to "hid[e]" her illnesses because she did not want to be "judged" and have people think she was crazy.

She said that beginning around the end of 2006, she lived in St. Petersburg, Florida, for six or seven months. She returned to Tennessee in May 2007. The day before Thanksgiving 2007, she had a hysterectomy then began radiation treatment which lasted five months. She also began receiving mental health care from "Mental Health Co-Op in Nashville, Tennessee."

The Petitioner said that before 6:00 a.m. one morning in August 2008, someone knocked on her door. When she answered the door, the police were there and told her to get dressed. She was taken to Clarksville, and Sergeant Blevins asked her to sign something. She refused. The Petitioner said that "the lady" asked if she had ever attempted suicide. The Petitioner responded that she had, and "they put [her] in a cold room with no clothes on." She did not know how long she was there. When she was taken from the room, she was put into "a room with Courtney," then she was put in a regular cell by herself. She said that two weeks later, she was told "that I was going to a hearing to tell you – I don't know the right term, but [the trial court] asked me some questions and then that's how I know why I was here." The Petitioner said that she was not represented by counsel at the time but that several months later, counsel came to the jail to see her.

- 4 -

The Petitioner said that after counsel was appointed, the Petitioner was sent to "the state hospital" for an evaluation, which lasted two to three weeks. The Petitioner said that while she was in the Clarksville jail, she had problems with her memory. She said that she was "very sick," slept often, "was a zombie," and "had mental and physical sickness." She said that counsel did not ask her "anything" when visiting her at the jail.

The Petitioner said that during the bench trial, she did not understand what was happening because counsel had told her that she was not guilty. She did not, however, tell counsel that she did not understand. The Petitioner did not recall being questioned by counsel during trial; however, she recalled being questioned by the prosecutor and the trial court. She explained that she was having memory problems during trial but did not inform counsel of the problems. Nevertheless, she asserted that "you could look at me and tell there was something wrong."

The Petitioner said that she thought counsel should have called witnesses to testify on her behalf. In particular, the Petitioner thought her therapist, Dr. Paul Smith, should have testified. The Petitioner thought she told counsel about her treatment at the Mental Health Co-Op.

The Petitioner said that she was given medication when she went to jail, but the medication did not help. After she was sent to the women's prison, she was prescribed several medications that were helpful. She stated that she was "better now" than she was at the time of trial. The Petitioner complained that counsel told the Petitioner "she knew I was innocent [and that] she should have been more clear about what I was facing." Counsel also should have informed her of a plea offer made by the State. She said that counsel never advised her to accept a plea offer and that she had thought "if you're innocent you don't take a plea." The Petitioner did not know the terms of any plea offers made by the State.

The Petitioner said that counsel should have informed the trial court that the Petitioner had "mood swings" but that she did not have "violen[t] rage[s]" that would lead her to stab someone multiple times. Counsel never asked if the Petitioner had a history of violence.

The Petitioner recalled that a woman testified at trial that the Petitioner confessed to committing the murder. The Petitioner, however, did not remember meeting the woman. The Petitioner alleged that other prisoners were after her and that she also thought other people were after her at the time she was arrested. The Petitioner said that she "wasn't paranoid. I – I had just given up mentally."

The Petitioner said that she had no reason to kill the victim. She had money in the bank from a disability check but if she had needed money, she could have asked the

- 5 -

victim, who was her friend, for anything. The Petitioner said that when she left the bathroom, her cousin had "everything loaded in the car," and the victim was lying on the floor. The Petitioner grabbed her purse and ran to the car. The Petitioner said that she regretted leaving the victim; however, the victim was still alive when she left the house.

The Petitioner testified that counsel never discussed having a bench trial instead of a jury trial. When asked if she would have agreed to a bench trial, the Petitioner said that she was not sure. The Petitioner said counsel did not talk with her about having Dr. Steven Montgomery testify on her behalf, and she did not recall ever speaking with Dr. Montgomery.

The Petitioner acknowledged that she did not remember "much of what happened at all at [the bench] trial." She said that counsel did not explain why the Petitioner was convicted. The Petitioner wrote to counsel, but counsel never responded. The Petitioner contended that counsel should have prepared the Petitioner to testify at trial "so that I could speak up for myself." The Petitioner said that her co-defendant and cousin, Ms. Davis, lied in her testimony when she blamed the Petitioner for the offense.

The Petitioner said that she believed the outcome of the trial would have been different if counsel had produced more evidence regarding her mental health issues. She said that she was no longer depressed and did not hear voices and see things. She asserted that she was currently able to defend herself and understand the proceedings.

On cross-examination, the Petitioner said that the victim was killed in 1995. From 1994 until she went to Florida in 2006, she was being "evaluated" and "medicated" by the Mental Health Co-Op. She acknowledged that none of the mental health officials tried to have her committed and that she was taking care of herself and her grandmother at that time. She said that the mental health officials sent her to hospitals and counseling when she was depressed.

The Petitioner said that at the time of the offense, she was not depressed and was not "in the middle of one of [her] mental health" episodes. The State asked if "what [the Petitioner was] saying is not so much that [her] mental health should have been a defense at the time of the crime so much as [she] just didn't do it, correct?" The Petitioner responded, "I didn't do it. And I can't speak on my mental health back then, but if I was going to Mental Health Co-Op, they have all that information."

On redirect examination, the Petitioner said that before she was arrested for the victim's murder, she had been admitted to psychiatric hospitals more than twenty times. She stated that she began experiencing audio and visual hallucinations in "the 1980s" and that she occasionally acted upon the hallucinations. She refused to say that she no longer

experienced hallucinations, but she asserted that she did not want to hurt anyone, including herself.

On recross-examination, the Petitioner said that she had no memory of the bench trial. The Petitioner said that she had taken her medication and was "all right" on the day of the offense; however, she asserted that she "was sick before 1995 and [she] was sick after 1995." She recalled that she had been treated in the 1980s by Dr. Treadway.

Counsel testified that she had been licensed in Kentucky for almost eighteen years, that she had been licensed in Tennessee for about ten years, and that approximately seventy percent of her practice was devoted to criminal defense work. She was appointed to represent the Petitioner in 2008.

Soon after the appointment, counsel learned that the Petitioner "had a very lengthy mental health history." Counsel investigated that history and discovered that since becoming an adult, the Petitioner had been involuntarily committed on multiple occasions. Additionally, counsel's discussions with the Petitioner led her to believe that the Petitioner "still had mental health issues," including paranoia.

Counsel stated that the Petitioner frequently had trouble remembering things, which raised concerns about the Petitioner's competency to stand trial. Counsel was also concerned about the Petitioner's ability to understand plea negotiations. At times, the Petitioner understood what was transpiring, but she "seemed much more away at times than others. It was almost as though . . . she had lucid intervals." In addition to the Petitioner's competency to stand trial, counsel was concerned about the Petitioner's mental state at the time of the offenses.

Counsel requested a competency evaluation, and the Petitioner was found competent to stand trial. Counsel disagreed with that assessment and requested funding for a second evaluation. For the second evaluation, counsel obtained many of the Petitioner's mental health records;[1] however, many of her records were no longer available. Counsel was unable to obtain records from Dr. Treadway, who treated the Petitioner but had since retired and passed away. Counsel gave the records to the defense's mental health expert, Dr. Steven Montgomery, who was from Vanderbilt and had performed the second forensic evaluation of the Petitioner. Dr. Montgomery found the Petitioner competent to stand trial. He also found that an insanity defense could not be supported; however, a claim of diminished capacity was supported by the evidence. Counsel said that despite the finding of competency, she had concerns about the Petitioner and "never felt that she fully understood everything."

---

[1] The record does not clearly reflect if counsel had the Petitioner's mental records at the time of the first evaluation.

Counsel recalled that the trial took place over two days in 2010. Counsel discussed having a bench trial with the Petitioner, and the Petitioner agreed after being advised by counsel that her behavior and demeanor might be harmful in front of a jury. Counsel said that during the trial, the Petitioner occasionally "would drift." Counsel gave the Petitioner paper and a pen to write down things she thought were important. The Petitioner did not, however, make any notes during the two days of trial, which was unusual.

Counsel could not recall if the Petitioner's bank records from the time of the crime were available but remembered that the Petitioner testified about having money in the bank at the time of the offense. Counsel verified that the Petitioner was receiving disability checks "for her mental conditions" at the time of the offense. Counsel and the Petitioner spoke during the trial, and they discussed the testimony of the Petitioner's cousin, who was a co-defendant.

Counsel did not recall who Dr. Paul Smith was. She recalled explaining to the Petitioner "about why mental health testimony would be necessary and how it was relevant to her case, and why there was not live testimony from providers." Counsel said that one of the main issues at trial was whether the Petitioner suffered from diminished capacity that would reduce her culpability from first degree premeditated murder to second degree murder. Based on Dr. Montgomery's report, counsel and the prosecutor agreed that "a legitimate diminished capacity defense" existed, and they stipulated to the admission of the report. Accordingly, counsel "did not feel it was legally necessary to present that testimony to the Court." Counsel explained her reasoning to the Petitioner, and the Petitioner agreed. The trial court ultimately agreed with counsel's assertion of diminished capacity and found the Petitioner guilty of second degree murder instead of first degree premeditated murder.

Counsel stated that the felony murder charge was based upon a death occurring during the commission of a robbery. Counsel opined that the evidence of a robbery was sparse, noting that the only evidence of a robbery was a detective's testimony that he saw "physical dust holes[] where it appeared as though things had been removed, and because it had not been dusted there were just obvious signs that things were missing[.]" Counsel acknowledged, however, that the co-defendant testified that items had been removed from the victim's home in a trash bag or a laundry bin.

Counsel said that the Petitioner's case was complicated because of the time that had elapsed between the commission of the offense and the trial. Counsel said that the prosecutor was aware that the case against the Petitioner was "weak[]"due to the passage of time and the lack of DNA evidence. Counsel said that the prosecutor "was very favorable to [the Petitioner] in trying to resolve the case[.]" Counsel "begged" the

Petitioner to accept the plea agreement, but the Petitioner refused because she was adamant that she was innocent. Counsel did not testify regarding the terms of the State's plea offer.

Counsel said that the Petitioner's demeanor at the post-conviction hearing was "closer to what I believe was lucid at the time, but her reflections of what happened at the time were so inconsistent with – with the reality of the situation that – that I'm concerned that she may not be lucid today either." Counsel said that in retrospect, she could not think of anything she would have done differently.

On cross-examination, counsel agreed that she had concerns about the Petitioner's ability to understand certain parts of the proceedings, such as the plea negotiations, but stated that the Petitioner's lack of understanding was not the result of counsel's failure to expend time or effort in explaining things to the Petitioner. Counsel said sometimes the Petitioner understood, but other times she did not.

In its order, the post-conviction court held that counsel was not deficient. The post-conviction court, implicitly accrediting counsel's testimony, found that counsel "knew about the mental health issues and did everything she could through experts to use these issues for the benefit of her client." Additionally, the post-conviction court found that counsel communicated the State's plea offer to the Petitioner and that the Petitioner refused to accept it. Therefore, the post-conviction court found that the Petitioner failed to establish her claims of ineffective assistance of counsel and denied the petition. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction

court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner asserts that counsel was ineffective by failing to call witnesses to testify that the Petitioner was not a violent person, by failing to subpoena Dr. Paul Smith, by failing to inform the Petitioner of plea offers, by failing to adequately inform the Petitioner of the charges and sentences she was facing, by failing to prepare the Petitioner to testify at trial, and by failing to adduce evidence that the Petitioner had money in the bank at the time of the offenses to refute her motive to commit robbery.

We note that the Petitioner did not present any witnesses at the post-conviction hearing regarding her non-violent nature, nor did she have Dr. Paul Smith testify about her mental health issues. Further, although the Petitioner asserts that counsel failed to thoroughly research the Petitioner's mental health issues, she has not suggested any benefit additional research would have revealed. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit Dr. Smith may have offered to the Petitioner's case, nor may

we guess as to any evidence further investigation may have uncovered.  Id.  Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

Moreover, we note that the post-conviction court implicitly accredited counsel's testimony that she informed the Petitioner of the State's plea offers and that she talked with the Petitioner about having a trial or pleading guilty.  Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact.  See Henley, 960 S.W.2d at 579.  Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings.  See Fields, 40 S.W.3d at 458.  The Petitioner is not entitled to relief on this basis.

The Petitioner claims that counsel failed to adequately inform her of what she faced if the case proceeded to trial and failed to sufficiently prepare the Petitioner to testify at trial.  The Petitioner did not, however, say how she would have benefitted from further trial preparation.  Moreover, counsel said that she thoroughly investigated the Petitioner's mental health issues and had her evaluated twice for competency.  Because of her awareness of the Petitioner's mental difficulties, counsel took care to explain everything to Petitioner.  The post-conviction court implicitly accredited counsel's testimony in this regard.  We conclude that the Petitioner has failed to prove that counsel was deficient in her trial preparation and in advising the Petitioner.

Finally, we note that the Petitioner's assertion that counsel did not present any evidence that the Petitioner had money in the bank at the time of the offenses is belied by this court's opinion on direct appeal.  In that opinion, we noted the Petitioner's testimony that "[a]t the time of the victim's death in November 1995, [she] still had approximately $4,000 of the $7,000 initial lump sum disability payment she had been awarded in June" and that the Petitioner "described her financial status at that time as 'comfortable.'"  State v. Lajeanra E. Polk, No. M2011-00226-CCA-R3-CD, 2011 WL 5022816, at *4 (Tenn. Crim. App. at Nashville, Oct. 21, 2011).  This court further noted the Petitioner's testimony "that she had no reason to rob the victim because she had money of her own from her recent social security disability settlement."  Id. at *5.  The Petitioner did not adduce any proof at the post-conviction hearing regarding any additional evidence counsel could have presented at trial.  The Petitioner is not entitled to relief.

## III. Conclusion

Based upon the foregoing, we conclude that counsel was not ineffective and affirm the judgment of the post-conviction court.

_____

NORMA MCGEE OGLE, JUDGE